1
2
3
4
5
6
7

8              IN THE UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10   ROBERT LOUIS MIRANDA,

11              Petitioner,              No. CIV S-06-0333 MCE CHS P

12        vs.

13   THOMAS L. CAREY, Warden, et al.,

14              Respondents.            FINDINGS AND RECOMMENDATIONS

15   _____/

16   I.     INTRODUCTION

17              Petitioner Robert Miranda is a state prisoner proceeding pro se with a petition for

18   a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner was convicted of second degree

19   murder on November 5, 1985.  On April 27, 2005, the Board of Prison Terms (now the Board of

20   Parole Hearings and hereinafter Board) found him suitable for parole.  Petitioner challenges

21   California Governor Arnold Schwarzenegger's September 15, 2005, reversal of the Board's

22   decision.  Petitioner claims that the Governor's reversal violated his right to due process.[1]  Upon

23   careful consideration of the record and the applicable law, the undersigned will recommend that

24   _____

25        [1] Petitioner also argues that the Governor lacked the authority to review his parole grant
     under California Proposition 89.  This is a state law argument.  A federal writ is not available for
26   alleged error in the interpretation or application of state law.  See Estelle v. McGuire, 502 U.S.
     62, 67-68 (1991).  This argument will therefore not be addressed.

1

petitioner's petition for habeas corpus relief be granted.

II.      FACTUAL AND PROCEDURAL BACKGROUND

     A.      Facts

        The Board recited the facts of petitioner's commitment offense as follows:

        PRESIDING COMMISSIONER DALY: Okay.  Counsel, I'm going to - - I'm going to go through the Statement of Facts as they're spelled out in the Board report, dated August 15th, 2003 and:

            "This was a crime that occurred on November 1st, 1981 and the victim, David Larsen, was a 32-year-old merchant seaman.  He had been paid 1800 dollars in cash by his employer and on the same date, at about 11:00 p.m., the victim's corpse was found in San Francisco, lying on the sidewalk of Seneca Street.  A subsequent review of the victim's body revealed he had been stabbed numerous times.

            Initially, the victim was unable to be identified by Investigative Services because there was no available information on the identification - - on the corpse.  On November 1st, 1981, an employee for a local pizza restaurant, Tony Fano, F-A-N-O, reportedly found the victim's wallet.  A review of the wallet revealed the presence of personal papers and adequate identification of the victim, David Larsen.  It is noted that the victim's wallet was found approximately two blocks from the location of his body.  Supporting documents indicate that approximately four years later, on February 4th, 1985, inmate Miranda's sister, Diana Zelms, Z-E-L-M-S, contacted Inspector Erdlate, E-R-D-L-A-T-E, and informed him Miranda had admitted to killing the victim, David Larsen.  According to Ms. Zelms, Miranda had admittedly been patronizing the Algiers Bar located on Mission Street in San Francisco.  During his presence, inmate Miranda reportedly observed a man at the bar revealing a large amount of money in his wallet.  Subsequently, Miranda and his associate, Cliff Green, proceeded to follow the victim as he exited the bar.  Miranda and accomplice Green then proceeded to follow the victim as they rode along in Cliff Green's automobile and plotted to rob the victim.  Diana Zelms further states that Miranda exited the vehicle and proceeded to attack the victim with a knife, as he stabbed him in the neck several times and culminated the attack by taking the victim's aforementioned wallet containing a large amount of cash.  On February 27th, 1985, accomplice Cliff Green was officially interviewed by Inspector Erdlate.

2

1              At that time, Mr. Green essentially corroborated the
statement previously noted by Miranda's sister, Diana
2     Zelms.  However, Mr. Green did add that subsequent to
committing of the instant offense, he and Miranda returned
3     to the residence of Mr. Green, where Miranda proceeded to
change his bloodstained clothing and give Mr. Green two
4     hundred or three hundred of the victim's stolen money.  It
is further noted that Inspector Erdlate interviewed an
5     acquaintance of Miranda by the name of John Ray.  It is
noted that Mr. Ray also confirmed that Mr. Miranda had
6     admitted to him having perpetrated the instant offense.
Based upon the aforementioned information, Miranda was
7     apprehended by [the] San Francisco Police Department on
March 5th, 1985.  Pursuant to the preliminary hearing
8     transcripts, starting on page 70 through page 123 was the
testimony of Cliff Green.  Green states that he received a
9     telephone call from Miranda on the night of that David
Larsen was stabbed.  Miranda had indicated to Green that
10     Larsen wanted to buy some weed.  Green met Miranda and
Larsen at a gas station directly across from the Algiers Bar.
11     Both Miranda and Larsen got into the car driven by Green
for the purpose of giving Larsen a ride to get some weed.
12     Green drove Seneca - - to Seneca and Mission and parked
the car.  Both Miranda and Larsen got out of the car.  A
13     few minutes later, Miranda returned to the car and told
green, quote, let's go, end quote.  Green noticed what
14     appeared to be blood on Miranda's hands and asked him
what happened.  Green indicated that Miranda asked [sic],
15     quote, don't ask, you don't know nothing, end quote.
Green drove to his parents' house and Miranda washed up
16     and changed his clothes.  Miranda gave Green 700 dollars
that he owed him.  Green then drove Miranda to Miranda's
17     sister's, Diana Zelms' house.  It was not until the following
evening that Green and Miranda learned that David Larsen
18     had died.  Green also states that he believed Miranda was
under the influence of PCP because his eyes were glassy
19     and he was acting differently.  It is noted that Green was
convicted of PC 32, accessory after homicide.  Miranda is
20     in agreement with Green's testimony."

21  Petition at 72-77.

22           Petitioner told the Board that he met David Larsen at the Algiers Bar and that Mr.

23  Larsen asked if petitioner "could get him a pound of marijuana."  Id. at 77.  Petitioner then

24  contacted Cliff Green to arrange the purchase.  Id.  Mr. Green picked up petitioner and Mr.

25  Larsen and the three drove a few blocks before Mr. Green stopped the car to buy cigarettes.  Id.

26  At that point Mr. Larsen told petitioner that he had changed his mind did not want to purchase

3

1   the marijuana.  Id.  Mr. Larsen got out of the car and began to walk away.  Id.  Petitioner

2   described the events leading up to the stabbing as follows:

3          INMATE MIRANDA:  At that time I was high and under the
           influence and when he started walking away, I approached him and
4          said, hey, I just set this, you know, deal up.  We've got to go check
           it out.  I just got this guy out of bed.  It was about 11:30.  And he
5          said, I have changed my mind and I don't want to do it.  So I
           started arguing with him.  I said, well, we've got to at least check
6          this out.  So that escalated into an argument and then we started
           fighting and then at that point in time, I just pulled out my knife
7          and I stabbed him.

8          PRESIDING COMMISSIONER DALY: Okay.  It says, he said he
           was leaving so you grabbed him by the arm and told him he had to
9          go and at least check it out.  He swung his duffel bag at you.  Is
           that true?
10
11         INMATE MIRANDA: Yes.

12         PRESIDING COMMISSIONER DALY: And you started fighting
           in the middle of the street and the next thing you know, you had
13         your knife that you always carried in your knife case.  And that's
           because you were dealing drugs and - -

14         INMATE MIRANDA: No.  That was because I worked at the
           shipyards and I was a rigger and we used it to cut rope all the time
15         so I'd always have it right on the side of (inaudible).

16         PRESIDING COMMISSIONER DALY: Okay.  You started
           slinging and punching with it and he fell down to the ground and
17         you reached in and took his wallet and then jumped in the car and
           had - -Cliff drove you away.  Did Cliff see what was going on?
18
19         INMATE MIRANDA: Yes, he did.

20         PRESIDING COMMISSIONER DALY: Okay.  And you said you
           had no idea he was dead.  Did - - was there anything you did to try
21         to check on him?

22         INMATE MIRANDA: I was - - I was so panicked and so freaked
           out, I just ran to the car and then we left.  We drove away.

23   Id. at 78-79.

24          On September 26, 1985, petitioner pled guilty to second degree murder while

25   armed with a deadly weapon and was sentenced to a term of 16 years to life on November 5,

26   1985.  Answer, Exhibit A at 2-4.

B.      2005 Hearing

On April 27, 2005, the Board held a Subsequent Parole Consideration Hearing for petitioner.  Petition at 64.  At the conclusion of that hearing the Board found petitioner suitable for parole, stating:

> PRESIDING COMMISSIONER DALY: Okay.  We're back on record in the matter of Robert Miranda.  And the Panel has reviewed all of the information received from the public and relied on the following circumstances in concluding that the prisoner is suitable for parole and would not pose an unreasonable risk of danger to society or a threat to public safety if released from prison.
>
> The prisoner has no juvenile record of assaulting others.  And while imprisoned, he had enhanced his ability to function within the law upon release through his participation in educational programs, self-help therapy, vocational programs, institutional job assignments and correspondence courses.  And I want to elaborate on this just a little bit.  The inmate has completed two vocations, vocational Eyewear certification on December 15th of '04.  And he is certified by the American Board of Optometry and he completed his vocational Silk-screening in - - on August 21st of 1992.  He also received his GED in - - I show 1989, but we had 1987 in the records.  At any rate, you do have your GED and you have worked in PIA Optical.  You've worked as a lead man, as a plumber, you've worked as a clerk, you've worked in the Canteen and you've also worked as a barber.  You have taken a number of correspondence courses at Solano Adult School.  You've had Substance Abuse Program, Beginning Reading Curriculum, Advanced Reading Curriculum, Job and Life Skills Curriculum, Parenting for Young Parents Curriculum, Math and Language Arts Curriculum.  These are all the PLATO courses and then from the (indiscernible) Bible Studies, you have taken a - - many, many of the courses.  Also, through the American Bible Academy, you have taken six courses through there.  Crossroads Bible Institute, you've had two of their classes.  Solano Chapel Studies, you've completed the Christian Discipleship and you are currently in attendance at the Family Stations Bible College.
>
> Self-help programs, you started out working on the Men's Advisory Council here at Solano.  You had Victim Offenders Learning Together at Vacaville in '95 to '97.  Alcoholics Anonymous, almost continuously.  Narcotics Anonymous at - - here at Solano.  In January of '96, you had the Breaking Barriers Program.  You also had the Advanced Breaking Barriers Program and you've had the Framework for Recovery.  I have the Creative Conflicts course, which was also taken on January 29th of '04.  You have been - - received a number of laudatories and you've

5

1    also been receiving above average to exceptional work reports.

2    Because of maturation, growth, greater understanding and I won't
     say advanced age, but older age, you have a reduced probability of
3    recidivism.  You have realistic parole plans, which include a job
     offer and/or family support.  In fact, you've had extremely strong
4    family support throughout your incarceration from the very
     beginning.  You've maintained close family ties and you've made
5    amends with your family members.  You have maintained positive
     institutional behavior and the Panel does note that you did have
6    some write-ups and you've not had a discipline for any drugs or
     alcohol since 1990 and there was just one at that time.  You have
7    shown signs of remorse and you understand the nature and the
     magnitude of the offense and you accept responsibility for the
8    criminal behavior and have a desire to change towards good
     citizenship.
9
     The Panel has also noted that there is no letter or physical presence
10   from the District Attorney's Office.  There is no letter from the
     police agency.  And the one member of the victim's family spoke
11   very eloquently about the pain that [the] loss of David Larsen had
     meant to their family.  And also spoke of reconciliation which is
12   very rare in these cases.

13   The psychiatric, psychological factors, the psychiatric,
     psychological report, dated February 2nd, of '05 by Dr. Nancy Van
14   Couvering is a favorable report.  And in that report, Dr. Van
     Couvering indicates that your Global Assessment score is 85 and
15   that you have good functioning in all areas.  That you are
     interested and involved in a wide range of activities.  You are
16   socially affective, generally satisfied with life and no more than
     every day problems or concerns.  And she also goes on to say that
17   you have completed your GED.  You've been employed as a
     procurement clerk in Maintenance and Repair.  You've worked in
18   Canteen, IDL, Kitchen, as a barber, as a plumber and certified
     American Board of Optometry in the Voc Lens Lab.  She says if
19   released, you would like to work in Optics.  In prison, you have
     been - - she talks about the disciplines that you have, so that was
20   taken into consideration.  You've been clean and sober for the past
     12 years and actually, it's been longer than that.  And you have
21   adopted a religious faith, which you practice and:

22        "The inmate's life crime was committed under the
          influence of drugs and alcohol.  There is no question that
23        he needs and will continue to need program support for that
          addiction.  On the other hand, he has established strong ties
24        with the Christian community in prison and intends to
          continue those ties if released.  And he has been
25        incarcerated for 20 years and his last 115 was 11 years ago.
          And I concur with Dr. Clair's previous evaluation, that his
26        present risk to the community is low."

                                        6

And then we go to Dr. Clair's psychiatric evaluation and in Dr. Clair's psychiatric evaluation, he refers to a 1997 report, which concluded that you are progressing very well throughout your participation.  And it says:

> "Almost exactly a year after that evaluation and as a matter of fact, the inmate gives a precise date of October 14th, 1998, the inmate found that he was born again.  He has become almost excessively religious and talks of being a new creature in Jesus Christ.  He is a constant reader of the Bible.  He feels that any possible new life on the streets for him will be complete [sic] if his [sic] is not spreading the word, even if he must interrupt this activity to earn a living."

It said:

> "The inmate is being genuine in what he says and this provides a further positive in a behavioral picture, which suggests that this man is no longer a threat to public order."

Respectfully committed - - submitted, Dr. Dean Clair, Psychiatrist.

/////

Petition at 139-44.

C.   Governor's Review

On September 15, 2005, California Governor Arnold Schwarzenegger reversed the Board's decision, concluding in his statement of the reasons for his decision that:

> The gravity of this crime alone is sufficient for me to conclude that [petitioner's] release from prison would pose an unreasonable risk to public safety.

> Mr. Miranda has been incarcerated for more than 20 years now and is 49 years old.  But after carefully considering the very same factors the Board must consider, I find the gravity of the second-degree murder he committed presently outweighs any factors supportive of his parole.  Accordingly, because I believe Mr. Miranda's release from prison would pose an unreasonable risk of danger to society at this time, I REVERSE the Board's 2005 decision to grant him parole.

/////

Answer, Ex. C at 20.

/////

/////

7

1       D.      Habeas Review

2               On November 10, 2005, petitioner filed a petition for writ of habeas corpus in the

3   San Francisco County Superior Court.  Answer, Ex. D at 23.  That petition was denied in a

4   reasoned opinion on January 9, 2006.  Answer, Ex. E at 53.  Petitioner then filed a petition with

5   the California Court of Appeal on January 31, 2006.  Answer, Ex. F at 58.  That petition was

6   summarily denied on March 14, 2006.  Answer, Ex. G at 100.

7               On March 28, 2006, petitioner attempted to file a petition in the California

8   Supreme Court, however, that petition was rejected by the clerk as untimely.  See Docket # 11 at

9   2.  Petitioner filed this federal petition on February 16, 2006.

10              Respondent filed a motion to dismiss arguing petitioner had not exhausted his

11  claims in the California Supreme Court.  Docket # 8.  On September 26, 2007, the District Judge

12  adopted Findings and Recommendations denying that motion because petitioner's attempt to file

13  in the California Supreme Court was improperly denied by the clerk who failed to give him the

14  benefit of the mailbox rule.  See Docket #'s 11-12.

15  III.    APPLICABLE STANDARD OF HABEAS CORPUS REVIEW

16              An application for a writ of habeas corpus by a person in custody under a

17  judgment of a state court can be granted only for violations of the Constitution or laws of the

18  United States.  28 U.S.C. § 2254(a).

19              Federal habeas corpus relief is not available for any claim decided on the merits

20  in state court proceedings unless the state court's adjudication of the claim:

21              (1) resulted in a decision that was contrary to, or involved an
                unreasonable application of, clearly established federal law, as
22              determined by the Supreme Court of the United States; or

23              (2) resulted in a decision that was based on an unreasonable
                determination of the facts in light of the evidence presented in the
24              State court proceeding.

25   28 U.S.C. § 2254(d).

26  /////

1   Although "AEDPA does not require a federal habeas court to adopt any one

2   methodology," Lockyer v. Andrade, 538 U.S 63, 71 (2003), there are certain principles which

3   guide its application.

4   First, the "contrary to" and "unreasonable application" clauses are different.  As

5   the Supreme Court has explained:

6   A federal habeas court may issue the writ under the "contrary to"
    clause if the state court applies a rule different from the governing
7   law set forth in our cases, or if it decides a case differently than we
    have done on a set of materially indistinguishable facts.  The court
8   may grant relief under the "unreasonable application" clause if the
    state court correctly identifies the governing legal principle from
9   our decisions but unreasonably applies it to the facts of the
    particular case.  The focus of the latter inquiry is on whether the
10  state court's application of clearly established federal law is
    objectively unreasonable, and we stressed in [Williams v. Taylor,
11  529 U.S. 362 (2000)] that an unreasonable application is different
    from an incorrect one.

12  /////

13  Bell v. Cone, 535 U.S. 685, 694 (2002).  It is appropriate to look to lower court decisions to

14  determine what law has been "clearly established" by the Supreme Court and the reasonableness

15  of a particular application of that law.  See Duhaime v. Ducharme, 200 F.3d 597, 598 (9th Cir.

16  2000).

17  Second, the court looks to the last reasoned state court decision as the basis for

18  the state court judgment.  Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002).  So long as the

19  state court adjudicated petitioner's claims on the merits, its decision is entitled to deference, no

20  matter how brief.  Lockyer, 538 U.S. at 76; Downs v. Hoyt, 232 F.3d 1031, 1035 (9th Cir. 2000).

21  /////

22  IV.   DISCUSSION OF PETITIONER'S CLAIM

23  All of petitioner's arguments rely on a claim of the denial of Constitutional due

24  process.

25   1)   Description of Claim

26  Petitioner argues that the Governor's decision is based on "frozen factors" and is

9

1   without "some evidence" to support it.  Petition at 5.  Petitioner therefore argues that the

2   Superior Court's finding of some evidence was unreasonable.  Id.

3               2)      State Court Opinion

4               The San Francisco County Superior Court found some evidence to support the

5   Governor's decision stating in part:

> Here, the Governor noted that the petitioner, at [the] time of the
> commission of the crime, had a lengthy criminal history, a history
> of drug abuse and the petitioner continued to use drugs while in
> prison.  (Gov. Reversal pp. 1).  The Governor recognizes that
> petitioner has remained discipline free for over a decade and has
> participated in a variety of self-help programs.
>
> The Governor recognizes that petitioner has upgraded
> educationally, vocationally and has confirmed plans to live at a
> drug-treatment facility in Stanislaus County.  (Gov. Reversal pp.
> 2).  Petitioner does not have financial support in Stanislaus
> County, but has a job offer in Sacramento County and an offer to
> interview in San Mateo County.  (Gov.  Reversal pp. 2).
>
> The Governor does not doubt that petitioner committed a heinous
> second-degree murder and notes that petitioner has provided two
> versions of events.  (Gov. Reversal pp. 2).  The Governor states
> that petitioner stabbed the victim numerous times in the neck, had
> an opportunity to stop, but did not.  (Gov. Reversal pp. 2).  After
> stabbing the victim, petitioner stole his wallet.  (Gov. Reversal. pp.
> 2).
>
> The Governor goes on to state that the gravity of the crime alone is
> sufficient to conclude that petitioner's release would be an
> unreasonable risk to public safety and outweighs any factors
> supportive of his parole.  (Gov. Reversal pp. 3).
>
>                              * * *
>
> The Court is limited in reviewing the Governor's decision.  It
> cannot grant relief to petitioner simply because it may disagree
> with the Governor's decision.  Here, the Governor's parole
> decision is supported by "some evidence relevant to the factors the
> Governor is required to consider under article V, section(b) [of the
> California Constitution]."  In re Rosenkrantz, supra, 29 Cal.4th at
> p. 626.  Furthermore, the Governor recognizes the Petitioner's
> accomplishments, although he feels he is not yet suitable for
> parole.  It appears the Governor has reviewed the Petitioner's
> record, giving "individualized consideration" to the "specified
> criteria."

> Furthermore, because the Governor found the Petitioner unsuitable for parole, no proportionality analysis needed to be undertaken.  In re Dannenberg (2005) 34 Cal.4th 1061, 1083, 1098.  Petitioner was not denied due process when his parole grant was reversed by the Governor.

Answer, Ex. E at 54-55.

        3)     Applicable Law

The Due Process Clause of the Fourteenth Amendment prohibits state action that deprives a person of life, liberty, or property without due process of law.  A person alleging due process violations must first demonstrate that he or she was deprived of a liberty or property interest protected by the Due Process Clause and then show that the procedures attendant upon the deprivation were not constitutionally sufficient.  Kentucky Dep't of Corrections v. Thompson, 490 U.S. 454, 459-60 (1989); McQuillion v. Duncan, 306 F.3d 895, 900 (9th Cir. 2002).

A protected liberty interest may arise from either the Due Process Clause of the United States Constitution or state laws.  Board of Pardons v. Allen, 482 U.S. 369, 373 (1987).  The United States Constitution does not, of its own force, create a protected liberty interest in a parole date, even one that has been set.  Jago v. Van Curen, 454 U.S. 14, 17-21 (1981).  However, "a state's statutory scheme, if it uses mandatory language, 'creates a presumption that parole release will be granted' when or unless certain designated findings are made, and thereby gives rise to a constitutional liberty interest."  McQuillion, 306 F.3d at 901 (quoting Greenholtz v. Inmates of Nebraska Penal, 442 U.S. 1, 12 (1979)).  In this regard, it is clearly established that California's parole scheme provides prisoners sentenced in California to a state prison term that provides for the possibility of parole with "a constitutionally protected liberty interest in the receipt of a parole release date, a liberty interest that is protected by the procedural safeguards of the Due Process Clause."  Irons v. Carey, 505 F.3d 846, 850-51 (9th Cir. 2007) (citing Sass v. Cal. Bd. of Prison Terms, 461 F.3d 1123, 1128 (9th Cir. 2006); Biggs v. Terhune, 334 F.3d 910, 914 (9th Cir. 2003); McQuillion, 306 F.3d at 903; and Allen, 482 U.S. at 377-78 (quoting

11

1   Greenholtz, 442 U.S. at 12)).  Accordingly, this court must examine whether the deprivation of

2   petitioner's liberty interest in this case violated due process.

3           It has been clearly established by the United States Supreme Court "that a parole

4   board's decision deprives a prisoner of due process with respect to this interest if the board's

5   decision is not supported by 'some evidence in the record,' Sass, 461 F.3d at 1128-29 (citing

6   Superintendent v. Hill, 472 U.S. 445, 457 (1985)); see also Biggs, 334 F.3d at 915 (citing

7   McQuillion, 306 F.3d at 904), or is "otherwise arbitrary," Hill, 472 U.S. at 457.

8           When assessing whether a state parole board's suitability decision, or in the

9   present case, the Governor's reversal of the Board's suitability decision, was supported by "some

10  evidence," the analysis "is framed by the statutes and regulations governing parole suitability

11  determinations in the relevant state." Irons, 505 F.3d at 851.  Thus, this court must:

12          look to California law to determine the findings that are necessary
            to deem a prisoner unsuitable for parole, and then must review the
13          record in order to determine whether the state court decision
            holding that these findings were supported by "some evidence" in
14          [petitioner's] case constituted an unreasonable application of the
            "some evidence" principle articulated in Hill.
15  Id.

16          California regulations requires that the Board "determine whether a prisoner is

17  presently too dangerous to be deemed suitable for parole based on the 'circumstances tending to

18  show unsuitability' and the 'circumstances tending to show suitability' set forth in Cal. Code.

19  Regs., tit. 15 § 2402(c)-(d)."  Irons, 505 F.3d at 662-63.

20          The Irons court described the regulations as follows:

21          [T]he circumstances tending to show that a prisoner is unsuitable
            include: (1) the commitment offense, where the offense was
22          committed in "an especially heinous, atrocious or cruel manner";
            (2) the prisoner's previous record of violence; (3)"a history of
23          unstable or tumultuous relationships with others"; (4) commission
            of "sadistic sexual offenses"; (5) "a lengthy history of severe
24          mental problems related to the offense"; and (6) "serious
            misconduct in prison or jail." Cal. Code. Regs., tit. 15 § 2402(c).
25          Circumstances tending to show that a prisoner is suitable for parole
            include: (1) the prisoner has no juvenile record; (2) the prisoner
26          has experienced reasonably stable relationships with others; (3) the

                                                12

prisoner has shown remorse; . . . (6) the prisoner lacks any significant history of violent crime; . . . (8) the prisoner "has made realistic plans for release or has developed marketable skills that can be put to use upon release"; (9) "[i]nstitutional activities indicate an enhanced ability to function within the law upon release." Cal. Code. Regs., tit. 15 § 2402(d).

/////

Id. at 663 n.4.

In California, the overriding concern in determining parole suitability is public safety and the focus is on the inmate's current dangerousness. In re Dannenberg, 34 Cal. 4th 1061, 1086 (Cal. 2005); In re Lawrence, 44 Cal. 4th 1181, 1205 (Cal. 2008). The California Supreme Court has stated:

> [T]he Penal Code and corresponding regulations establish that the fundamental consideration in parole decisions is public safety [and] the core determination of "public safety" . . . involves an assessment of an inmate's *current* dangerousness. . . . [A] parole release decision authorizes the Board (and the Governor) to identify and weigh only the factors relevant to predicting "whether the inmate will be able to live in society without committing additional antisocial acts." These factors are designed to guide an assessment of the inmate's threat to society, *if released*, and hence could not logically relate to anything but the threat *currently* posed by the inmate.

In re Lawrence, 44 Cal. 4th at 1205-06 (internal citations omitted).

Thus, the California Supreme Court has expressly rejected the notion that the mere existence of one or more unsuitability factors described in the State's regulations is itself necessarily sufficient to support the ultimate conclusion that the inmate currently poses an unreasonable risk of danger if released, which is the "focus" of and only relevant determination underpinning the parole decision. Id. at 1210. As a matter of California law, the individualized consideration of the specified factors that is due an inmate "requires more than rote recitation of the relevant factors with no reasoning establishing a rational nexus between those factors and the necessary basis for the ultimate decision-the determination of current dangerousness." See id.

Accordingly, in reviewing a decision by the Board or the Governor to deny parole to an inmate, "the relevant inquiry is whether some evidence supports the decision of the Board

1   or the Governor that the inmate constitutes a current threat to public safety, and not merely

2   whether some evidence confirms the existence of certain factual findings." Id. at 1212 (citing In

3   re Rosenkrantz, 29 Cal. 4th 616, 658 (Cal. 2002); In re Dannenberg, 34 Cal. 4th at 1071; In re

4   Lee, 143 Cal. App. 4th 1400, 1408 (2006)).

5                   4)      Discussion

6           In reading the Governor's decision it is not clear that he relied upon anything

7   other than the circumstances of the commitment offense.  The Governor stated, "[t]he gravity of

8   this crime alone is sufficient for me to conclude that his release from prison would pose an

9   unreasonable risk to public safety" and "I find that the gravity of the second-degree murder he

10  committed presently outweighs any factors supportive of his parole."  Answer, Ex. C at 21.

11          However, the Superior Court noted that the Governor cited petitioner's criminal

12  history and history of drug abuse.  Id. at 19-21.  Thus under the Superior Court's interpretation

13  the Governor based his denial on:  a) petitioner's criminal history, b) his history of drug abuse,

14  and c) the circumstances of the commitment offense.

15                  a)      Criminal History

16          In his decision the Governor cited petitioner's "lengthy criminal history that

17  included selling drugs."  Answer, Ex. C at 19.  The Governor stated petitioner was convicted as a

18  minor for possession of alcohol, and as an adult for battery, giving false information to a police

19  officer and receiving stolen property.  Id.  The Governor also stated that petitioner was arrested

20  for petty theft, resisting arrest, theft of a credit card, receiving stolen property, petty theft, assault

21  with a deadly weapon, and multiple drug offenses.  Id.  The Governor acknowledged that none of

22  the arrests resulted in a conviction.

23          It appears from petitioner's post conviction probation report that the crimes the

24  Governor noted petitioner was arrested for and those he was convicted of actually arose from

25  common incidents.  Thus, in 1976 petitioner was arrested for assault with a deadly weapon and

26  vandalism, but only convicted of misdemeanor battery.  Answer, Ex. B at 7.  In 1983, petitioner

1   was arrested for resisting arrest, petty theft, and receiving stolen property, but was only

2   convicted of receiving stolen property.  Id.  It appears petitioner had only three criminal

3   convictions as an adult, all of which were misdemeanors and none of which involved significant

4   violence.[2]  Petitioner's probation report does not show any arrests for drug offenses.[3]  Id.

5           Regardless, there is no disagreement that at the time of the commitment offense,

6   his conviction, and possibly sometime into his prison term, petitioner was dangerous.  The issue

7   under California law is whether there is "some evidence" to support the Governor's decision that

8   at the time of the Governor's decision petitioner was "a current threat to public safety."  In re

9   Lawrence, 44 Cal. 4th at 1212 (citing In re Rosenkrantz, 29 Cal. 4th at 658; In re Dannenberg,

10  34 Cal. 4th at 1071; In re Lee, 143 Cal. App. 4th at 1408).

11          As of the 2005 hearing petitioner's most recent prior conviction was almost 22

12  years old.  Answer, Ex. B at 7.  What appears to be the lone prior conviction possibly involving

13  violence was almost 30 years old.  Id.  While incarcerated his last, and it appears only, serious

14  rules violation was 15 years prior to the hearing.[4]  Petition at 87.  At the time of the 2005 hearing

15  petitioner had a classification score of 19, the lowest possible.[5]  Id. at 101.

16          There does not appear to be any nexus between petitioner's criminal history and

17  the Governor's decision that petitioner was then currently dangerous.

18                  b)      History of Drug Abuse

19          In his decision the Governor noted that at the time of the commitment offense

20  ────────────────

21      [2] According to petitioner his 1976 conviction for battery stemmed from a fight with
    another man who apparently discovered petitioner stealing gas from the man's car.  Petition at

22  92.

23      [3] Petitioner did however admit to the Board that he had sold drugs prior to the
    commitment offense.  Petition at 77.

24      [4] It appears from the 2005 Hearing transcripts that petitioner had some "write- ups" in

25  1994.  Petition at 89.

26      [5] A classification score reflects the security control needs on an inmate, where higher
    scores correspond to greater needs.  See Cal. Code. Regs., tit. 15 § 3375(d).

15

1  petitioner was "a 26-year-old alcoholic and drug addict [and] was under the influence of PCP

2  and alcohol."  Answer, Ex. C at 19.  Petitioner told the Board at his 2005 hearing that in the three

3  and a half years between his commitment offense and his arrest he became "worse on alcohol,

4  trying to drink away the pain and the thought of [his commitment offense]" and that he was "full

5  of drugs at the time . . ."  Petition at 80.  Petitioner also told the Board that he had continued to

6  use marijuana while incarcerated until 1990.  Id. at 87-88.

7          As with his criminal history, the issue is not whether petitioner's substance abuse

8  problem at the time of the commitment offense and up through 1990 made him dangerous.  The

9  issue is whether there is "some evidence" to support the Governor's decision that at the time of

10 the Governor's decision petitioner was "a current threat to public safety."  In re Lawrence, 44

11 Cal. 4th at 1212 (citing In re Rosenkrantz, 29 Cal. 4th at 658; In re Dannenberg, 34 Cal. 4th at

12 1071; In re Lee, 143 Cal. App. 4th at 1408).

13         Petitioner stated that he ceased using drugs and alcohol in 1990 and there is no

14 evidence in the record to dispute that statement.  Petition at 87-89.  Petitioner therefore had 15

15 years of sobriety at the time of the 2005 hearing.  Id. at 87.  Prior to the 2005 hearing petitioner

16 had been involved Narcotics Anonymous and Alcoholics Anonymous for some time.  Id. at 140.

17 Petitioner's 2005 psychiatric report noted that while petitioner "needs and will continue to need

18 program support for [his] addiction . . . . his present risk to the community is low."[6]  Id. at 143.

19         Even the Governor's decision stated that "[petitioner] has made seemingly solid

20 efforts to address his history of substance-abuse by participating in Alcoholic Anonymous,

21 Narcotics Anonymous, Framework for Recovery, and a religious-based 12-step program.  These

22 are all positive factors supportive of his parole."  Answer, Ex. C at 20.

23  _____

24      [6] The Board ordered as special conditions of petitioner's parole that he: 1) not use
   alcoholic beverages, 2) submit to alcohol testing, 3) submit to anti-narcotic testing, 4) submit to
25 THC testing, 5) participate in a substance abuse program, such as AA or NA, 6) attend Parole
   Outpatient Clinic, and 7) parole to the Modesto Gospel Mission, a 13-month residential recovery
26 facility.  Petition at 124, 145.

1  /////

2          There does not appear to be any nexus between petitioner's history of substance

3  abuse and the Governor's decision that petitioner was then currently dangerous.

4                  c)      <u>Circumstances of The Commitment Offense</u>

5          Regarding the circumstances of the commitment offense the Governor stated:

6          Regardless of which version of the crime is accurate, there is no
           doubt that Mr. Miranda committed a heinous second-degree
7          murder.  Whether it was during the course of a robbery or an
           altercation with the victim, Mr. Miranda pulled out a knife and
8          stabbed Mr. Larsen numerous times, killing him.  According to his
           sister's account in the probation officer's report, some of those
9          stabs were to the victim's neck.  Mr. Miranda had a clear
           opportunity in between each blow to stop but instead continued to
10         stab Mr. Larsen.  At the 2005 hearing, the Board asked Mr.
           Miranda if he tried to check on the victim after the stabbing and he
11         replied that he panicked and fled.  I note, however, that Mr.
           Miranda did manage to steal the victim's wallet before entering his
12         friend's car and fleeing the area, leaving Mr. Larsen to die from his
           wounds.  This was a brutal, senseless crime.  The viciousness of
13         the repeated stabbings and failure to even check on Mr. Larsen's
           condition demonstrates an exceptionally callous disregard for
14         human suffering.  The gravity of this crime alone is sufficient for
           me to conclude that his release from prison would pose an
15         unreasonable risk to public safety.

16  Answer, Ex. C at 21.

17          The circumstances of the commitment offense are one of fifteen factors relating to

18  an inmate's unsuitability or suitability for parole under California regulations.  Cal. Code. Regs.,

19  tit. 15 § 2402(c)(1)-(d).  When denial is based on these circumstances the California courts have

20  stated that:

21         A prisoner's commitment offense may constitute a circumstance
           tending to show that a prisoner is presently too dangerous to be
22         found suitable for parole, but the denial of parole may be
           predicated on a prisoner's commitment offense only where the
23         Board can "point to factors beyond the minimum elements of the
           crime for which the inmate was committed" that demonstrate the
24         inmate will, at the time of the suitability hearing, present a danger
           to society if released.  <u>[In re] Dannenberg</u>, 34 Cal.4th [1061] at
25         1071, 23 Cal.Rptr.3d 417, 104 P.3d 783 (Cal.2005).  Factors
           beyond the minimum elements of the crime include, <u>inter</u> <u>alia</u>, that
26         "[t]he offense was carried out in a dispassionate and calculated

                                            17

1    manner," that "[t]he offense was carried out in a manner which
     demonstrates an exceptionally callous disregard for human
2    suffering," and that "[t]he motive for the crime is inexplicable or
     very trivial in relation to the offense." Cal. Code. Regs., tit. 15
3    § 2402(c)(1)(B), (D)-(E)."

4    Irons, 505 F.3d at 852-53; see also In re Weider, 145 Cal.App.4th 570, 588 (2006) (to support

5    denial of parole, the "factors beyond the minimum elements of the crime" "must be predicated

6    on "some evidence that the particular circumstances of [the prisoner's] crime-circumstances

7    beyond the minimum elements of his conviction-indicated exceptional callousness and cruelty

8    with trivial provocation, and thus suggested he remains a danger to public safety.")

9            The relevant inquiry "is not merely whether an inmate's crime was especially

10   callous, or shockingly vicious or lethal, but whether the identified facts are probative to the

11   central issue of current dangerousness when considered in light of the full record before the

12   Board or the Governor." In re Lawrence, 44 Cal.4th at 1221; In re Dannenberg, 34 Cal. 4th at

13   1070-71.

14           There is no question that the circumstances of petitioner's commitment offense

15   are senseless, tragic, and warranted his incarceration.  However, the murder occurred almost 24

16   years prior to the 2005 hearing, and after petitioner had been incarcerated for 20 years.  During

17   those 20 years, as the Governor stated, petitioner "worked . . . to enhance his ability to function

18   within the law upon his release."  Answer, Ex. C at 19.  The issue before the Governor was

19   whether, after the commitment offense and after petitioner's work to rehabilitate himself,

20   petitioner was currently dangerous at the time of review.

21           Petitioner was not cited for violent behavior at any point during his incarceration,

22   he participated in several forms of self-help and therapy designed to address problems with

23   violence and substance abuse, and his most recent psychiatric evaluation determined that his

24   present risk to the community was low.

25           The circumstances of the commitment offense were not such that they continue to

26   be predictive of petitioner's current dangerousness this many years after commission of the

1  offense, given the uncontested facts in the record demonstrating significant rehabilitation,

2  changes in his psychological and mental attitude, and exemplary behavior in prison.  See In re

3  Lawrence, 44 Cal.4th at 1217; In re Elkins, 144 Cal.App.4th 475, 498-99 (2006) ("[T]he

4  commitment offense . . . is an unsuitability factor that is immutable and whose predictive value

5  'may be very questionable after a long period of time.' . . . Reliance on an immutable factor,

6  without regard to or consideration of subsequent circumstances, may be unfair, run contrary to

7  the rehabilitative goals espoused by the prison system, and result in a due process violation.")

8        There does not appear to be any nexus between the circumstance of petitioner's

9  commitment offense and the Governor's decision that petitioner was then currently dangerous.

10 /////

11 /////

12 V.      CONCLUSION

13        The factors the Governor relied upon were petitioner's criminal history, his

14 history of drug abuse, and the circumstances of the commitment offense.  Petitioner will never be

15 able to change his criminal history, his history of drug abuse, or the circumstances of the

16 commitment offense no matter how much time passes.  Those are historic and unchanging

17 factors.

18        While a parole denial based solely on unchanging factors can initially satisfy due

19 process requirements, the continued reliance over time on unchanging factors such as the

20 circumstances of the commitment offense may result in a due process violation.  Biggs, 334 F.3d

21 at 916.  In Irons, the Ninth Circuit explained that Biggs represents the law of the circuit that

22 continued reliance on a prisoner's commitment offense or conduct prior to imprisonment could

23 result in a due process violation over time.  Irons, 505 F.3d at 853.  The factors cited by the

24 Governor do not support the conclusion that petitioner was then currently dangerous.

25        Under California law:

26        the circumstances of the commitment offense (or any of the other

19

1    factors related to unsuitability) establish unsuitability if, and only
     if, those circumstances are probative to the determination that a
2    prisoner remains a danger to the public.  It is not the existence or
     nonexistence of suitability or unsuitability factors that forms the
3    crux of the parole decision; the significant circumstance is how
     those factors interrelate to support a conclusion of current
4    dangerousness to the public.

5    In re Lawrence, 44 Cal.4th at 1212.

6            As previously cited in part, the Governor acknowledged petitioner's rehabilitative

7    achievements, stating:

8            Mr. Miranda also has worked during his incarceration to enhance
             his ability to function within the law upon release.  He has
9            upgraded educationally and vocationally by earning his GED,
             becoming certified as an optician, and completing vocational
10           training in silk screening.  He has held several skilled institutional
             jobs, including as a plumber, and has participated in a wide array
11           of self-help and therapy, including Creative Conflict Resolutions,
             Stress Management, Men's Violence Prevention, PLATO classes,
12           Victims/Offenders Learning Together, and Breaking Barriers.  He
             has participated in extracurricular activities including Men's
13           Advisory Council and several religious activities, and has made
             seemingly solid efforts to address his history of substance-abuse by
14           participating in Alcoholics Anonymous, Narcotics Anonymous,
             Framework for Recovery, and a religious-based 12 step program.
15           These are all positive factors supportive of his parole.

16           Furthermore, Mr. Miranda has received favorable evaluations in
             recent years from correctional and mental-health professionals,
17           including assessments that his risk to the community probably
             would be low if released.  He has also maintained supportive
18           relationships with family and friends, and one member of the
             victim's family has recently voiced support for his parole.
19   /////

20   Answer, Ex. C at 19.

21           The Board's 2005 decision credited petitioner with completing additional therapy

22   and educational courses and with "maturation, growth, and greater understanding."  Petition at

23   141.  The Board found that petitioner had "realistic parole plans, which include[d] a job offer,"

24   "extremely strong family support," and "maintained positive institutional behavior."  Id.  The

25   Board found that petitioner had "shown signs of remorse," that he understood "the nature and the

26   magnitude of the offense," that he accepted responsibility for his behavior and had a "desire to

                                            20

1   change towards good citizenship."  Id.  Petitioner's accomplishments are not recited here in

2   order to be balanced or weighed but instead to answer the inquiry of whether some evidence

3   supports the decision of the Governor that petitioner constituted a current threat to public safety.

4           Here there was no evidence to support the Governor's conclusion that petitioner

5   was currently dangerous and therefore would have constituted a current threat to public safety if

6   released.  Because there was no evidence, the Governor's decision resulted in an arbitrary

7   deprivation of petitioner's liberty interest in parole and violated due process.  The state court's

8   determination to the contrary was therefore unreasonable.

9   /////

10          In accordance with the above, IT IS RECOMMENDED that:

11      1.      Petitioner's application for a writ of habeas corpus be granted;

12      2.      Respondents be directed to release petitioner from custody within 10 days of any

13  order adopting these findings and recommendations, with petitioner subject to the terms and

14  conditions set by the Board[7]; and

15      3.      Respondents be directed to file, within 10 days of petitioner's

16  release, a notice with the court confirming the date on which petitioner was released.

17          These findings and recommendations are submitted to the United States District

18  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within ten days

19  after being served with these findings and recommendations, any party may file written

20  objections with the court and serve a copy on all parties.  Such a document should be captioned

21  "Objections to Magistrate Judge's Findings and Recommendations."  The parties are advised that

22

23          [7] At the 2005 hearing the Board calculated petitioner's term and assessed a total
    confinement of 240 months, less post-conviction credits of 78 months, for a total confinement of
24  162 months.  Petition at 145.  As of that hearing petitioner had already served 235 months.  Id.
    The matter therefore need not be sent back to the Board to set a term.  Petitioner has served past
25  his release date and is entitled to his release.  See McCullough v. Kane, 2007 WL 593227, at *9
    (N.D. Cal. June 1, 2007); Brown v. Kane, 2007 WL 1288448, at *6 (N.D. Cal. May 2, 2007);
26  Thomas v. Brown, 513 F.Supp.2d 1124, 1136-37 (N.D. Cal. December 21, 2006); Rosenkrantz
    v. Marshall, 444 F.Supp.2d 1063, 1087 (C.D. Cal. August 1, 2006).

1 | failure to file objections within the specified time may waive the right to appeal the District

2 | Court's order.  Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998);  Martinez v. Ylst, 951 F.2d

3 | 1153 (9th Cir. 1991).

4 | DATED: July 28, 2009

5 | CHARLENE H. SORRENTINO
UNITED STATES MAGISTRATE JUDGE